Penny BRANNON

v.

OSHKOSH B'GOSH, INC., and Lilly Crisp, Individually.

No. 2:94–0090.

United States District Court, M.D. Tennessee, Northeastern Division.

Aug. 9, 1995.

---

William Bush, Rural Legal Services, Cookeville, TN, for plaintiff.

Timothy K. Garrett, Bass, Berry & Sims, Nashville, TN, for defendants.

## MEMORANDUM

MORTON, Senior District Judge.

## I. INTRODUCTION

Plaintiff Penny Brannon brought this action against her former employer and its human resources manager, alleging that her termination for excessive absenteeism was in violation of her rights under the Family and Medical Leave Act of 1993 (the "Act" or "FMLA"). 29 U.S.C. § 2601 et seq. Plaintiff claims that certain absences from employment in December 1993 and January 1994 constituted "leave" under the FMLA and should not have counted against her under her employer's absence policy. Plaintiff seeks lost wages, interest, liquidated damages and equitable relief.

Currently before the court are plaintiff's motion for partial summary judgment on the

issue of liability and defendants' motion for summary judgment. Also before the court are defendant's motion to strike certain materials in support of plaintiff's motion, and plaintiff's motion to strike materials that defendant failed to produce in discovery. The court heard oral argument on these motions on July 11, 1995. For the reasons set forth below, plaintiff's motion for partial summary judgment is granted, and defendants' motion for summary judgment is denied. Also, defendants' motion to strike is granted in part and denied in part, and plaintiff's motion to strike is granted.[1]

## II. FACTS

### A. *Background*

Plaintiff Penny Brannon began working for OshKosh B'Gosh, Inc. (OshKosh) on October 19, 1992. Defendant OshKosh is a corporation with a place of business in Jamestown, Tennessee, engaged in the manufacture of children's garments. Defendant Lilly Crisp is the Human Resources Manager at the Jamestown plant. Plaintiff worked in a production sewing job in the Jamestown facility, which employs approximately 260 employees. At the outset of her employment, plaintiff confirmed in writing that she received a copy of Oshkosh's employee handbook.

### B. *OshKosh's Absenteeism Policy*

In its handbook, OshKosh explained its absenteeism policy, a policy which is based on a point system. An employee receives points due to tardiness, an absence, or a "leave-early." Under the policy, an employee is assessed one point per hour that she is absent part of the day. If an employee is absent an entire day, 8 points are assessed. If an employee is out sick for longer than one day, up to four consecutive days, it is considered one "occurrence" under OshKosh's attendance policy, for which 8 points are assessed. If an employee misses no days in a

---

**1.** The two motions to strike will not be discussed in the body of this memorandum. The court did not rely on OshKosh company policy 804.3 or any conclusions by the board of review in its decision and, to that extent, the motions to strike references to those documents are granted. As for defendant's motion to strike certain affidavit testimony of Penny and Tommy Brannon as hearsay or inappropriate expert testimony, the motion is denied in part. Plaintiff and Tommy Brannon may testify to specific facts, i.e., that Miranda had a fever on Friday, January 7. All hearsay and generalizations that Miranda was "seriously ill," however, were not considered.

month, she is rewarded with an eight-point credit that month for perfect attendance.

Oshkosh recognizes some circumstances under which an employee's absence will not count as points, such as jury duty or work-related injury leave. Also, any absence that qualifies under FMLA should not be counted against the employee. Finally, only points accumulated in the most recent 12 months are considered. Points more than one year old are dropped from an employee's total.

If an employee accumulates a certain number of points within any 12-month period, certain disciplinary action is taken. When an employee accumulates more than 80 points in a 12-month period, he or she may be terminated for excessive absenteeism. Discipline under the point system is administered as follows:

(1) When an employee accumulates 30 points, she is verbally counseled.

(2) When an employee accumulates 45 points, she receives a written consultation memo.

(3) When an employee accumulates 60 points, she receives a second written consultation memo.

(4) When an employee receives 80 points, she receives a third and final written consultation memo and is terminated from employment.

(Crisp Depo., Ex. 8). At the end of April 1993, plaintiff had accumulated 30 points. She received the first level of discipline under OshKosh's absenteeism control policy, an "informal coaching" from her supervisor, Penny Leffew. On June 10, 1993, plaintiff received the second level of discipline—a written consultation memo—because her points exceeded 45 at the end of May 1993. On July 27, 1993, plaintiff received the third level of discipline—a second consultation memo—after she accumulated 60 points. By

the end of November 1993, plaintiff had accumulated 70 points.

Plaintiff was absent on two separate occasions in December 1993 and January 1994, for which OshKosh assessed points. As a result, plaintiff accumulated 82.5 points and was terminated on January 12, 1994. These two periods of absence are the subject of this lawsuit. If one or both absences were covered under the FMLA, then her termination due to absenteeism violated the FMLA.[2]

### C. *The December Absences*

On Monday, December 13, 1993, Plaintiff reported to work feeling sick and left early due to illness and vomiting. Plaintiff was absent from work the afternoon of December 13 and all day on December 14, 15 and 16. Plaintiff called in sick each morning. Plaintiff returned to work on Friday, December 17. Plaintiff gave Ms. Leffew a note stating that plaintiff had seen Dr. Mark Allen Clapp on Wednesday, December 15. The note contained no other information regarding her absence.

Upon plaintiff's return to work, there was little or no discussion about the extent of plaintiff's medical condition. No one at OshKosh sought details from plaintiff about her illness, its severity, her visit to the doctor or course of medications prescribed. Nor did plaintiff offer any information about her illness, other than the fact she had an "upper respiratory infection." [3] Oshkosh did not request, and plaintiff did not offer, any further medical documentation from a health care provider.

Dr. Mark Clapp, a family practitioner in Jamestown, Tennessee, saw plaintiff on December 15, 1993. Dr. Clapp testified by deposition on March 29, 1995. He did not personally recall anything about the examination, and his testimony was based exclusively on what was reflected in plaintiff's clinical records.

---

**2.** If no points had been charged for Penny Brannon's absence in December 1993, her point total would not have exceeded 80 as of January 12, 1994, and she would not have been fired for excessive absenteeism. Similarly, if no points had been charged for Ms. Brannon's absence on January 10–11, 1994, her point total would not have exceeded 80 as of January 12, 1994, and

she would not have been fired for excessive absenteeism.

**3.** Written information was supplied to OshKosh later in support of plaintiff's claim for unemployment compensation. No other information was requested prior to that time.

Plaintiff presented herself to Dr. Clapp complaining of nausea and vomiting, some neck pain, a nonproductive cough, diarrhea and flu-like symptoms. Upon physical examination, Dr. Clapp noted a runny nose, but no other remarkable abnormalities. He diagnosed gastroenteritis, an infection of the intestines that often results in vomiting, nausea and diarrhea, and an upper respiratory infection. He prescribed three medications: Phenergan VC with codeine (antihistamine, decongestant, cough suppressant); Septra (antibiotic); and Prednisone (anti-inflammatory).

Dr. Clapp's office gave Ms. Brannon a "certificate to return to work or school," indicating simply that Ms. Brannon had been in Dr. Clapp's office on December 15, 1993. Dr. Clapp's signature on the note was signed by Janie Ledbetter, an office assistant.

There is no indication in the chart that Dr. Clapp advised Ms. Brannon to remain off work. Dr. Clapp's records indicate only that Ms. Brannon "desire[d] to get back to work." Dr. Clapp usually makes a notation if he advises a patient to remain off work, but admits he probably doesn't do it every time.

In this case, Dr. Clapp cannot testify that plaintiff was physically unable to work due to her illness. He did testify that, based on his examination of her on December 15, it would be reasonable for her to be absent from work for three and one-half days. He also testified that one medication he prescribed, Phenergan VC with codeine, may cause drowsiness and would affect plaintiff's ability to operate a sewing machine, although he did not tell plaintiff to refrain from operating a sewing machine.

As a result of plaintiff's absence on December 13–16, OshKosh assessed plaintiff 8 points under its absence policy. Plaintiff knew that the absence had counted against her. By the end of December, plaintiff had accumulated 75.5 points.

### D. *The January Absences*

Plaintiff's three-year-old daughter, Miranda Brannon, became ill on Thursday evening, January 6, 1994. According to her parents, her symptoms were fever, sore throat, runny nose and vomiting.[4] Miranda stayed home from day care Friday, January 7, 1994. Because of plaintiff's high point situation, plaintiff's husband Tommy Brannon stayed home from work on January 7, 1994, to care for Miranda.

Plaintiff claims that on Friday, January 7, 1994, she told Ms. Crisp that Miranda was sick and that plaintiff may have to miss work on Monday if Miranda did not get better. Plaintiff claims that Ms. Crisp told her that if plaintiff missed work because of Miranda's sickness, points would not be assessed against her if she brought in a doctor's note. Ms. Crisp denies that any such conversation took place.

Miranda continued to be ill over the weekend, and plaintiff and Tommy Brannon took her to the Fentress County Hospital emergency room on Sunday, January 9, 1994. Miranda was treated by Dr. Jonathan Allred.

According to the medical records, Miranda was admitted to the emergency room at 4:45 p.m. on Sunday with a fever of 100.4 degrees, runny nose, cough and sore throat. According to her parents, these symptoms existed two or three days before her visit to the emergency room. Upon physical examination, Dr. Allred noted that Miranda was alert and non-toxic, i.e., that she was active and didn't appear lethargic or acutely ill. His examination revealed a low-grade fever, a runny nose and reddened throat. He diagnosed acute pharyngitis (infected throat) and an upper respiratory infection. He prescribed Pediazole, an antibiotic. He also recommended Triaminic or Dimetapp, Tylenol and increased fluids. He told Miranda's parents to return in two or three days if her condition did not improve, and sooner if her condition worsened. Dr. Allred did not see Miranda again for this illness and, to his knowledge, Miranda had no complications. In fact, Miranda's condition improved and her fever went down on Tuesday, January 11, 1994.

It is Dr. Allred's opinion that a child should not report to day care if he or she has

---

4. Defendants take issue with whether Miranda was vomiting on January 6–8. Dr. Allred's notes reflect that Miranda had "no vomiting or diarrhea."

a fever. Based on Miranda's health condition that he examined on January 9, 1994, he recommended that she stay home from day care on the following two days, January 10 and January 11, 1994. The medical records contain Dr. Allred's notation "Mom off work until 1/12/94."

Dr. Allred gave plaintiff a note for work that said "Please excuse off work till 1–12–94." On January 10 or 11, 1994, plaintiff's husband went to the OshKosh plant and gave Dr. Allred's note to Ms. Leffew. Plaintiff also called OshKosh the morning of January 10 and January 11 to notify the plant of her absence. Specifically, plaintiff told Ms. Crisp that Miranda was too sick for her to come to work.

On January 12, 1994, Miranda returned to day care, and plaintiff returned to work. Like after the December absences, there was little discussion about Miranda's illness. No one at OshKosh inquired about the diagnosis of Miranda's illness, its severity, the doctor visit or about any medications or treatment. OshKosh did not request, and plaintiff did not offer, documentation concerning Miranda's illness from Dr. Allred, other than Dr. Allred's note of January 9.[5]

### E. *Plaintiff's Termination*

When plaintiff returned to work on January 12, 1994, Ms. Crisp reviewed plaintiff's point chart. The chart reflected that, at the end of December, 1993, plaintiff had 75.5 points and, if 8 points were assessed for the absences on January 10–11, plaintiff would exceed 80 points and be terminated. After consulting with Ms. Leffew and Ms. Dulcie Brown, the production manager, and after consultation with a corporate human relations specialist, Ms. Crisp informed plaintiff that day that she was terminated for excessive absenteeism.

At the time of Penny Brannon's termination, no one at OshKosh asked plaintiff for any information necessary for the determination of whether the absences in question potentially qualified under the FMLA. Today, in light of a new employment policy implemented April 15, 1995, it is OshKosh's policy that if an employee is out sick for more than three days, management asks the employee if he or she wants to obtain further documentation so that management can determine whether the FMLA applies.

### III. STANDARD OF REVIEW

The standards governing the decision on a motion for summary judgment are well established. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, a dispute about a material fact is "genuine" within the meaning of Fed. R.Civ.P. 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient. *Id.* at 252, 106 S.Ct. at 2512. Moreover, a nonmoving party cannot avoid summary judgment on the basis of "nebulous assertions." *Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133, 138 (6th Cir.1993). In ruling on a motion for summary judgment, this court must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of materi-

---

**5.** Dr. Allred later wrote a letter about the absence, which was provided to OshKosh as part of the claim for unemployment compensation. The letter, dated January 24, 1994, stated in part:
Re: Penny Brannon
To Whom It May Concern:
The above's child was seen in the emergency room on 1–9–94 with persistent fever for 2–3 days. After evaluation, I felt the child should stay in a home environment rather than day care to facilitate healing and avoid spreading to other children.
The parents informed me that they had no one to care for the child except the day care. So therefore, the mother was given an excuse off work for 1–9–94 to 1–12–94.
[Allred Depo. Ex. 5].

al fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990).

▪ A party seeking summary judgment may prevail on a pure question of law. *Watkins v. Shared Hosp. Services Corp.*, 852 F.Supp. 640, 643 (M.D.Tenn.1994). In its resolving of the parties' motions for summary judgment, the court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. *Background*

In 1993, Congress passed the Family and Medical Leave Act. The Act establishes the right of any eligible employee to take up to 12 weeks of leave during any 12–month period for one or more of the following reasons:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter;

(B) Because of the placement of a son or daughter with the employee for adoption or foster care;

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition;

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1) (1995). Under the FMLA, any employee who takes leave for one of these reasons is entitled, upon return from such leave, "to be restored" to the same position the employee held when the leave commenced. 29 U.S.C. § 2614(a)(1)(A).

Any employer who denies an eligible employee the same or equivalent employment upon return from FMLA leave violates the Act. 29 U.S.C. § 2615(a)(1). Where an employee has violated the Act, the employee is entitled to compensatory damages equal to the amount of any wages, salary, employment benefits, or other compensation which she was denied or lost as a result of the violation, interest on the compensatory damages, and, unless the court concludes that the employer acted in good faith and reasonably believed it had complied with the Act, liquidated damages equal to the amount of compensatory damages plus interest. 29 U.S.C. § 2617(a)(1)(A). Finally, an employer is liable for equitable relief if appropriate, including reinstatement. 29 U.S.C. § 2617(a)(1)(B).

The Act defines key terms in the statute, including "employee," "employer" and "serious health condition." 29 U.S.C.A. § 2611(2), (4), (11). For purposes of this case, the parties agree that plaintiff is an eligible employee and defendant is an employer as defined by the Act. 29 U.S.C.A. § 2611(2), (4). One major dispute between the parties, however, is whether plaintiff or her daughter Miranda had a "serious health condition" to necessitate the absences in issue.

### B. *Serious Health Condition*

Plaintiff argues that her absence on December 13–16 was due to her own "serious health condition" and, therefore, protected under 29 U.S.C. § 2612(a)(1)(D). Further, plaintiff argues that her January 10–11 absences were required in order to care for her daughter with a serious health condition and, therefore, protected under § 29 U.S.C. § 2612(a)(1)(C). Defendant argues that neither plaintiff nor Miranda had a serious health condition. 29 U.S.C. § 2612(a)(1).

#### 1. *Statutory construction*

The Act defines "serious health condition" as:

**(11) Serious health condition**

The term "serious health condition" means an illness, injury, impairment, or

physical or mental condition that involves—

   (A) inpatient care in a hospital, hospice, or residential medical care facility, or

   (B) continuing treatment by a health care provider.

29 U.S.C.A. § 2611(11) (1995).

■ A review of the legislative history behind the FMLA helps to illustrate what Congress meant by "serious health condition." The Senate Report states:

## MEANING OF SERIOUS HEALTH CONDITION

The definition of "serious health condition" in section 101(10) is broad and intended to cover various types of physical and mental conditions. The policies and interpretations discussed in connection with a "serious health condition" apply to both section 102(a)(1)(C) and section 102(a)(1)(D). [codified at 29 U.S.C. § 2612(a)(1)(C) & (D).]

With respect to an employee, the term "serious health condition" is intended to cover conditions or illnesses that affect an employee's health to the extent that he or she must be absent from work on a recurring basis or for more than a few days for treatment or recovery. With respect to a child, spouse or parent, the term "serious health condition" is intended to cover conditions or illnesses that affect the health of the child, spouse or parent such that he or she is similarly unable to participate in school or in his or her regular daily activities.

The term "serious health condition" is not intended to cover short-term conditions for which treatment and recovery are very brief. It is expected that such conditions will fall within even the most modest sick leave policies. Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period. Complications arising out of such procedures that develop into "serious health conditions" will be covered by the act. It is intended that in any case where there is doubt whether coverage is provided by this act, the general tests set forth in this paragraph shall be determinative.

.    .    .    .    .

Examples of serious health conditions include but are not limited to heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth. All of these conditions meet the general test that either the underlying health condition or the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery. They also involve either inpatient care or continuing treatment or supervision by a health care provider, and frequently involve both.

S.Rep. No. 3, 103d Cong., 1st Sess.1993, 1993 U.S.C.C.A.N. 3, at pp. 30–31. The legislative history makes clear that Congress intended the FMLA to cover serious illnesses that last more than a few days. *Id.* Minor illnesses, on the other hand, should be addressed through the employer's sick leave policy and not through the FMLA. If the court were to limit its inquiry to the plain wording of the statute and its accompanying legislative history, it appears as though Penny Brannon's illness in December 1993 and Miranda's illness in January 1994, do not qualify as "serious health conditions." Intestinal infections, respiratory infections and sore throats are not listed among the examples of serious health conditions. And while the list is not exhaustive, a head cold accompanied by fever, sore throat, diarrhea and/or vomiting is not as grave as any of the health conditions listed. In fact, an upper respiratory infection, gastroenteritis and pharyngitis seem

more akin to "minor illness[es] which last only a few days," something Congress sought to exclude from FMLA coverage. *Id.* The court's inquiry, however, cannot stop here.

### 2. *Department of Labor Regulations*

Congress authorized the Secretary of Labor to promulgate regulations "necessary to carry out" the FMLA. 29 U.S.C.A. § 2654 (1995).[6] The regulations offer a more detailed explanation of what types of illnesses qualify as "serious medical conditions" under the FMLA. One regulation states in part:

§ 825.114 What is a "serious health condition" entitling an employee to FMLA leave?

(a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:

(1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility ... or

(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g. physical thera-

pist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

.  .  .  .  .

(b) ... Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

(c) ... Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave. . . .

29 C.F.R. § 825.114 (1995).

As a result of this regulation, the Department of Labor developed somewhat of a brightline test for what illnesses qualify as serious health conditions. If an employee is (1) incapacitated[7] for more than three days, (2) seen once by a doctor, and (3) prescribed a course of medication, such as an antibiotic, she has a "serious health condition" worthy of FMLA protection.[8]

---

**6.** The Labor Department issued interim regulations on June 4, 1993, and final regulations on January 6, 1995. 29 C.F.R. § 825.100 et seq. The court will look to the final regulations for guidance.

**7.** The regulations further define "incapacity" as, i.e., "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." 29 C.F.R. § 825.114(a)(2)(i).

**8.** When considered together with the legislative history, the Department of Labor's test will include many more ailments than Congress intended the FMLA to cover. Furthermore, the regulation excludes specific illnesses such as the flu, while providing FMLA protection to those that are arguably less serious. For example, strep throat is a serious health condition if an employee is incapacitated for more than three days. It is easily treatable with antibiotics, however, and the patient will likely see significant improve-

### 3. *Plaintiff's Illness*

■ Upon review of the undisputed facts surrounding Ms. Brannon's illness, plaintiff cannot prove that her absence from work on December 13–16, 1993 was "because of a serious health condition that [made her] unable to perform the functions of [her job]." 29 U.S.C. § 2612(a)(1)(D).

Plaintiff does not meet the definition of serious health condition because, although she saw a doctor and was given three prescriptive drugs, there is no proof that plaintiff was "incapacitated" for more than three calendar days. Plaintiff stayed home from work for more than three days, but plaintiff cannot show she was unable to work, or that her absence was "due to" her illness. 29 C.F.R. § 825.114(a)(2)(i). First, Dr. Clapp never advised plaintiff to remain off work. Dr. Clapp's speculation that it was reasonable for someone to miss three or four days for her type of illness is insufficient to prove that the absence was necessary. Second, plaintiff's own testimony that she was "too sick to work" is also insufficient to prove that her absence was necessary. Finally, Dr. Clapp cannot testify that plaintiff was unable to perform the functions of her job at the Jamestown plant in light of her illness. 29 U.S.C. § 2612(a)(1)(D).

Because Dr. Clapp's testimony is not in dispute, and because it is legally insufficient to prove that her illness necessitated her absence, the court concludes that plaintiff's December 1993 absences are not worthy of FMLA protection. Accordingly, OshKosh's assessment of points for those absences did not violate the Act.

### 4. *Miranda's Illness*

■ Plaintiff was absent on January 10–11, 1995 in order to care for her daughter, Miranda. If Miranda had a "serious health condition" as defined by the Act and regulations and if plaintiff gave sufficient notice, this absence was protected by the FMLA. 29 U.S.C. § 2612(a)(1)(C).

It is undisputed that Miranda visited a health care provider and was given a course of prescription medication. In addition, Dr. Allred's testimony sufficiently proves that Miranda was "incapacitated" for a period of more than three days. Dr. Allred advised that Miranda should stay home from day care until she was free from fever, and therefore he told plaintiff to remain off work Monday and Tuesday, January 10–11, 1994. Also, Miranda's parents discovered that Miranda had a fever on Thursday, January 6. This is not disputed. According to the medical testimony, if Miranda had a fever, she should have stayed home on Friday, January 7. Miranda's parents are competent to testify that she had a fever throughout the weekend, and the medical records show a temperature of 100.4 on Sunday afternoon. This proof, coupled with the medical testimony that Miranda should have remained out of day care while she had a fever, is sufficient to prove that she was incapacitated for more than three consecutive calendar days.

Therefore, the court concludes that Miranda had a "serious health condition" as defined under the FMLA and regulations. If plaintiff satisfied the FMLA notice requirements, then her absence was protected under the FMLA.

### C. *FMLA Notice Requirements*

■ If an employee needs leave to care for her daughter with a serious medical condition, the Act requires that she give notice to her employer of the need for FMLA leave. 29 C.F.R. §§ 825.302, 825.303, 825.304 (1995). The Act itself is silent regarding the notice which an employee must provide to her employer when the need is not foreseeable. The regulations, however, provide that "when the need for leave ... is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable." 29 C.F.R. § 825.303(a). One regulation states:

**§ 825.303  What are the requirements for an employee to furnish notice to an**

---

ment within 48 hours of starting antibiotics. The flu can be more serious than strep throat, in that it is a viral infection and is often only treated symptomatically. A flu patient can be bedridden for a week, having visited the doctor and having been prescribed a decongestant, for example. Although the flu patient may pass the three-prong test, flu is specifically excluded from coverage. 29 U.S.C. § 824.114(c).

employer where the need for FMLA leave is not foreseeable?

(a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as is practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. *The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means.* The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303 (1995) (emphasis added).

Another regulation states in part:

§ 825.208 **Under what circumstances may an employer designate leave, paid or unpaid, as FMLA leave and, as a result, count it against the employee's total FMLA leave entitlement?**

(a) In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section. . . .

The employer's designation decision must be based only on information received from the employee or the employee's spokesperson (e.g., if the employee is incapacitated, the employer's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave).

.     .     .     .     .

(1) An employee giving notice of the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act. If the employee fails to explain the reasons, leave may be denied.

.     .     .     .     .

(2) As noted in § 825.302(c), an employee giving notice of the need for unpaid FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave.

.     .     .     .     .

29 U.S.C. § 825.208 (1995).

These regulations make clear that an employee must tell her employer the reason she is absent from work before she will be entitled to FMLA protection. 29 C.F.R. §§ 825.208(a)(2); 303(b). In a light most favorable to the defendant, the court will assume the January 7, 1994 conversation between plaintiff and Ms. Crisp did not occur. Even so, because the need for leave was unforeseeable, plaintiff gave her employer notice that Miranda was sick "as soon as practicable." 29 C.F.R. § 825.208(a). After that, it was the employer's duty to make further inquiry to determine if the leave qualified for FMLA protection. 29 C.F.R. § 825.303(b). OshKosh made no inquiry, but simply assessed points.

OshKosh argues that it properly denied leave because plaintiff did not give proper notice under 29 C.F.R. § 825.208(e). That regulation states in part:

(e) Employers may not designate leave as FMLA leave after the employee has returned to work with two exceptions:

(1) If the employee was absent for an FMLA reason and the employer did not learn the reason for the absence until the employee's return (e.g., where the employee was absent for only a brief period), the employer may, upon the employee's return to work, promptly (within two business days of the employee's return to work) designate the leave retroactively with appropriate notice to the employee. If leave is taken for an FMLA reason but the employer was not aware of the reason, and the employee desires that the leave be counted as FMLA leave, the employee must notify the employer within two business days of returning to work of the reason for the leave. In the absence of such timely notification by the employee, the employee may not subsequently assert FMLA protection for the absence.

29 C.F.R. § 825.208(e)(1).

This regulation does not support defendant's argument, however, because OshKosh was aware of the reason for plaintiff's absence. On the mornings of January 10–11, and upon her return to work on January 12, 1994, plaintiff told Ms. Crisp that her daughter was sick. This was sufficient to put OshKosh on notice that the leave potentially qualified under 29 U.S.C. § 2612(a)(1)(C).

Therefore, because the plaintiff gave sufficient notice that her absence was necessitated by an FMLA-qualifying reason, her absence on January 10–11, 1995 was protected by the FMLA. Accordingly, OshKosh's assessment of points against plaintiff and subsequent termination of plaintiff violated the Act. 29 U.S.C. § 2615(a)(1).

## V. CONCLUSION

For the reasons set forth above, plaintiff's termination for excessive absenteeism violated the FMLA. Plaintiff's motion for summary judgment on the issue of liability is granted, and defendant's motion for summary judgment is denied. An appropriate order will be entered.

### *ORDER*

In accordance with the memorandum contemporaneously filed, the plaintiff's motion for summary judgment on the issue of liability (Docket No. 14) is hereby granted. Defendant's motion for summary judgment (Docket No. 18) is denied. Defendant's motion to strike (Docket No. 25) is granted in part and denied in part. Finally, plaintiff's motion to strike (Docket No. 29) is granted.

There remains the issue of damages. Within 20 days of the entry of this order, plaintiff shall submit a proposed order regarding damages and a memorandum in support. Defendant shall respond within 10 days. A hearing on damages and/or equitable relief, should the court determine that one is necessary, will be set after the court has reviewed the requested materials.

It is so ordered.