**Josephine ROBERTS, Plaintiff,**

v.

**HUMAN DEVELOPMENT ASSOCIATION, Defendant.**

**No. Civ. A. 95–Civ–3294 (DGT).**

United States District Court, E.D. New York.

May 8, 1998.

Robert Goodstein, Goodstein & West, New Rochelle, NY, for Plaintiff.

Richard M. Howard, Kaufman, Schneider & Bianco, LLP, Jericho, NY, for Defendant.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff sued her employer under 29 U.S.C. § 2601, *et seq.*, alleging that she was denied the benefits of the Family Medical Leave Act when she was terminated from her job. Defendant moves for summary judgment on the grounds that plaintiff's condition was not a "serious health condition" within the meaning of the statute. Plaintiff cross moves for summary judgment. For the reasons discussed below, defendant's motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied.

### Background

Defendant Human Development Association ("HDA") is an organization which provides health care to patients in their homes. Plaintiff was employed by HDA as a home health care aide for approximately seven years prior to the events which gave rise to this lawsuit.

On Thursday morning, May 25, 1995, plaintiff, then sixty-four years old, was working at the home of Marie Crupie, a woman in her eighties, when plaintiff began experiencing

what she describes as heavy post-menopausal vaginal bleeding. *See* Tr. Pl.Dep. at 52–54. Plaintiff states that at the time of this incident, she had been in menopause for approximately eight years and had never before experienced post-menopausal bleeding.[1]

According to her complaint, upon becoming aware of this condition, plaintiff called the emergency number at her office to request that a replacement attendant be sent to relieve her at Mrs. Crupie's home. Apparently, plaintiff was advised that the person with whom she needed to speak in order to place this request was not in the office and that plaintiff should call back. Plaintiff testified at her deposition that she called back several times over the course of the following two hours before she was eventually advised that a replacement attendant would be sent. Although the replacement had not yet arrived when plaintiff left Mrs. Crupie's home, plaintiff states that both Mrs. Crupie and her daughter, Lillian, told plaintiff that she should go and that Mrs. Crupie's daughter would stay with her mother until the replacement attendant arrived.[2]

Upon leaving her work site, plaintiff went directly to Kings County Hospital, where she waited in the emergency room for several hours before being treated. Plaintiff was ultimately seen by a doctor around 3:00 p.m. At approximately 4:00 p.m., plaintiff underwent a dilation and. curettage ("D and C").[3] *See* Compl. ¶ 5. Plaintiff's husband picked her up from the hospital and she returned home around 7:00 p.m. that evening.

Plaintiff was not specifically advised by any medical personnel that she was required to remain at home for any period of time following her release from the hospital. Plaintiff states that she planned to stay home Friday, May 26 and return to work on Monday, May 29, 1995. *See* Tr. Pl.Dep. at 211–13. Plaintiff called her office early the next morning, May 26, 1995, presumably to inform her supervisors of her status and that she would not be in that day, at which time she was informed that she had been terminated because she had left her job on the previous day before a replacement aide had arrived. Upon learning this, plaintiff had her husband drive her to HDA's offices, approximately a thirty minute drive from her house, in an attempt to offer proof of her outpatient hospitalization the day before and thereby save her job. This entreaty proved fruitless, however, and plaintiff filed a complaint with this court on July 10, 1995.

In her complaint, plaintiff alleges that she was terminated in violation of the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("the Act"). As her first cause of action, plaintiff claims that she was denied her twelve week period of leave pursuant to 29 U.S.C. § 2612 and she requests relief in an amount equal to the difference between twelve weeks of salary minus the salary she received from May 26, 1995 to date, as well as liquidated damages equal to the sum of

1. Plaintiff stated at her deposition that the condition first began on the morning of Thursday, May 25. The Emergency Department Triage Form that was completed at the Kings County Hospital emergency room, however, indicates that plaintiff told the intaking nurse that the bleeding had begun earlier that week and was getting heavier. This is evident from the line entitled "Chief Complaint" next to which the intaking nurse wrote: "[complains of] vaginal bleeding since Monday increasing." Def.'s Ex. H.

2. At her deposition, plaintiff testified that Lillian Crupie is approximately sixty years old and that she arrived at her mother's home on the morning of Thursday, May 25 with her two grandchildren, Mrs. Crupie's great-grandchildren, who were approximately two and four years old, respectively. Plaintiff stated that during the time she was on the phone with HDA trying to arrange for a replacement, Lillian Crupie got on the phone and spoke to someone at HDA's offices. Although plaintiff did not hear the entire conversation, plaintiff recalls Lillian Crupie telling the person on the phone that plaintiff was sick. Plaintiff also testified that on several prior occasions, Lillian Crupie had advised plaintiff that plaintiff was permitted to leave slightly before the end of her shift and that Ms. Crupie would stay with her mother until the replacement attendant arrived. *See* Tr. Pl.Dep at 49–51.

3. The American Medical Association Encyclopedia of Medicine defines D and C as "[a] gynecological procedure in which the endometrium (lining of the uterus) laid down after each menstrual period is scraped away.... D and C is commonly used in the diagnosis and treatment of menorrhagia (heavy menstrual bleeding) and other disorders of the uterus.... D and C is usually carried out under general anesthesia."

this amount. For her second cause of action, plaintiff alleges that she is entitled to be restored to the position she held when her leave commenced and she seeks relief in the form of all wages, employment benefits, or other compensation denied her from May 26, 1995 to date, as well as an additional amount of liquidated damages equal to the sum of this amount. Plaintiff seeks employment reinstatement and reasonable attorneys' fees as to both causes of action.[4]

### Discussion

### (1)

The Family Medical Leave Act permits an employee to take up to twelve weeks of leave during any twelve month period because, *inter alia*, of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An eligible employee who takes leave pursuant to the Act is entitled, upon return from such leave, "to be restored" to either the same position the employee held at the beginning of such leave or an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *See* 29 U.S.C. § 2614(a)(1). An employer is prohibited from interfering with or denying an eligible employee the rights and benefits provided by the Act. *See* 29 U.S.C. § 2615(a)(1).

Plaintiff claims that her termination occurred in violation of the Act because the medical condition which necessitated her leaving her job on May 25, 1995 constituted a serious health condition within the meaning of the Act. The Act defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—A) inpatient care in a hospital, hospice, or residential medical care facility; or B) continuing treatment by a health care provider." 29 U.S.C. 2611(11).

HDA argues that plaintiff's condition does not qualify as a serious health condition as a matter of law because plaintiff neither received inpatient treatment nor continuing treatment as those terms are used by the Act. HDA contends that plaintiff's condition of "post-menopausal bleeding and associated cramps" was a minor illness and as such, is exempted from the Act's coverage. *See* Def.'s Mem. at 2. Citing the legislative history of the Act, HDA emphasizes that Congress did not intend the Act to cover minor illnesses:

> The term "serious health condition" is not intended to cover short-term conditions for which treatment and recovery are very brief. It is expected that such conditions will fall within even the most modest sick leave policies. Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S.Code Cong. & Admin. News 1993 at 3, 31. *See also Boyce v. New York City Mission Soc'y*, 963 F.Supp. 290, 298–99 (S.D.N.Y.1997) (citing legislative history); *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F.Supp. 1108, 1121 (W.D.N.Y. 1996) ("It is clear that, in general, Congress intended the FMLA to cover illnesses lasting more than a few days.") (citing legislative history). For its argument that plaintiff's condition was a minor illness which is excluded from the Act's coverage, HDA relies on the legislative history of the Act which provides as examples of "serious health conditions" the following non-exhaustive list:

> heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or

---

**4.** Plaintiff has not worked anywhere else since her separation from HDA in May 1995. *See* Tr. Pl.Dep. at 183. However, plaintiff began working for HDA again beginning sometime in 1997 on a part time basis of two days per week. This arrangement apparently arose independently of plaintiff's pending lawsuit. Plaintiff testified at her deposition that she was offered a full time position by HDA but that she told them she only wanted to work part time. *See* Tr. Pl.Dep. at 185–86.

off the job, ongoing pregnancy, miscarriages, complications o· illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S.Code Cong. & Admin. News 1993 at 3, 31; *see also* 58 Fed.Reg. 31, 799 (1993). An examination of the congressional debate surrounding the Act reveals that "[t]his definition of 'serious health condition' is also intended to include emergency health conditions that require immediate short-term treatment to prevent serious ag·· gravation of the condition or to minimize the likelihood of longer term illness, injury, or disability." 139 Cong.Rec. S1348 (daily ed. Feb. 4, 1993) (statement of Rep. Harkin). Additionally, HDA refers to the Department of Labor's substantive regulations for the Act, issued pursuant to authority granted by the Act in 29 U.S.C. § 2654, which clarify what is meant by the phrase "serious health condition." [5]

**5.** The final regulations took effect on February 6, 1995 and thus are applicable to plaintiff's claim. *See* 69 F.R. § 2180. The regulation addressing the definition of "serious health condition" appears in 29 C.F.R. § 825.114 and provides:
(a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
(1) Inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or
(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
(i) A period of incapacity (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor,· or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

From these regulations the Department of Labor has devised a test for what illnesses qualify as serious health conditions. If an employee is 1) incapacitated ·(*i.e.*, unable to work, attend school or perform other regular activities due to the serious health condition, treatment therefor, or recovery therefrom) for more than three days; 2) seen once by a doctor; and 3) prescribed a course of medication, such as an antibiotic, she has a "serious health condition" which is covered by the Act. *See Boyce,* 963 F.Supp. at 299 (footnote omitted) (*citing Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1036 (M.D.Tenn.1995)); 29 C.F.R. § 825.114.

### (2)

Plaintiff did not receive inpatient care for her medical condition because she was not in the hospital overnight. Thus, in order to come within the Act's protection, she must demonstrate that she satisfies the "continuing treatment" alternative · of the "serious

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

\* \* \* \* \* \*

(b)· Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (*e.g.*, oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.
(c)· ... Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for · FMLA leave....

health condition" definition set forth in 29 U.S.C. § 2611(11). To do this, plaintiff must make a dual showing that she was incapacitated for more than three days and that she received continuing treatment by a health care provider. Indeed, only where an incapacity is shown is it necessary to proceed to consideration of whether the employee received "continuing treatment" within the meaning of the Act. *See Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 698 (5th Cir.1997). Thus, construing the facts in a light most favorable to the plaintiff, if she fails to show that she was incapacitated for more than three days, summary judgment is appropriate. *See Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1164–65 (N.D.Ohio 1997).

■ HDA argues that plaintiff in fact was not incapacitated following the D and C, since she was not instructed by a doctor to stay home the day following the procedure, but rather chose to do so on her own. HDA also appears to argue that plaintiff's ability to get into a car and be driven to HDA's office on Friday, May 26, demonstrates that plaintiff was not incapacitated as a result of her condition. HDA further contends that even if plaintiff had been instructed by a health care provider to take Friday off from work, her acknowledged ability to return to work on the Monday following her surgery demonstrates that she was not incapacitated for more than three days.

HDA's argument that the fact that plaintiff was able to be driven to HDA's offices on Friday, May 26 demonstrates that plaintiff was not incapacitated is without merit. Whether or not plaintiff was incapacitated as that term is used by the Act, the fact that she managed to travel to her employer's office moments after being told that she had been fired is indicative of her alarm at having received such upsetting news and her desire to try to save her job. If plaintiff was otherwise incapacitated, the mere fact that she was capable of traveling a short distance, chauffered by her husband, in order to plead for her job, would not mitigate this fact. The Labor Department's regulations indicate that the definition of incapacity is not complete immobility, but rather the "inability to work,

attend school or perform other regular daily activities." 29 C.F.R. § 825.114.

■ HDA's alternate arguments, that plaintiff was not incapacitated within the meaning of the Act because she was not instructed by doctors to remain at home the day after her surgical procedure, and because she was able, by her own admission, to return to work on Monday, May 29, are somewhat more credible. HDA points to case law holding that a decision to stay out of work which is not based on the recommendation of a doctor does not satisfy the incapacity requirement under the Act, notwithstanding that the decision may be a reasonable one on the part of the patient. *See Hodgens v. General Dynamics Corp.*, 963 F.Supp. 102, 106 (D.R.I.1997); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D.Tenn.1995). It is true that plaintiff here does not claim that she was advised by a health care provider that she should stay home the day after her D and C. In fact, plaintiff concedes that she was never so instructed. At plaintiff's deposition, the following exchange took place:

Q: And after you went to the hospital on the 25th of May 1995 you were able to return to work on that Monday?

A: The hospital?

Q: On May 25th, 1995—

A: Yes.

Q: —you went to the hospital because you had cramps and you were bleeding?

A: Yes.

Q: And on Friday you went to HDA's office?

A. Yes.

Q: To find out what happened to your job?

A: Yes.

Q: On Monday you would have been able to return to work, is that correct?

A: Yes.

Q: Would you have been able to return to work on Friday?

A. Not on Friday but on Monday.

Q: But you would not have been able to return to work on Friday?

A: Not on Friday.

Q: Did anyone tell you you couldn't work on Friday?

A: No, nobody told me I couldn't work on Friday.

Q: You just assumed you couldn't work on Friday?

A: Because I call on Friday and I could not go back to the job.

Q: But you were calling to go back to the job?

A: Yes.

Q: Was that going back on Friday or Monday?

A: And to tell them how I feel.

Q: Were you calling to go back on Friday or Monday?

A: Monday.

Q: But you could have worked on Friday?

A: Yes, I could have worked on Friday.

Tr. Pl.Dep. at 211–13.

HDA makes much of the fact that plaintiff ultimately "conceded" at her deposition that she could have worked on Friday, May 25. However, when this statement is viewed in the context of the testimony which precedes it, it is clear that plaintiff steadily maintained that she believed she would not be physically able to return to work until Monday, May 29. Thus, plaintiff's testimony will not be interpreted as the fatal admission which HDA seeks to portray it as.

As is evident from her deposition testimony, plaintiff did concede that she was not instructed that she could not return to work on Friday, the day immediately following the D and C. Notwithstanding that plaintiff was not specifically advised by a doctor to stay home after the medical procedure she underwent, it is certainly understandable that plaintiff decided to take the next day off from work to recuperate. A D and C, while a relatively common procedure, is nonetheless a surgical procedure which is performed while the patient is under general anesthesia.

It is perfectly plausible that a person who left the hospital at 6:00 p.m. following such a procedure would not be feeling up to par the very next morning and would need to take some time to recover before being able to return to her normal activities. Furthermore, plaintiff was sixty-four years old at the time she had this procedure. While it is conceivable that a younger woman might not require even a day of recuperation after this type of surgical procedure, it is to be expected that an older woman's healing process may be a slower one. Finally, although doctors did not explicitly tell plaintiff to remain at home the day following her D and C, it would appear that such an instruction is rather superfluous. It is to be expected that a doctor will advise a patient of any unusual lifestyle restrictions or limitations following surgery. It is not necessarily to be expected, however, that a doctor will specifically advise a patient to take a reasonable period of time to recuperate from the immediate impact of being placed under general anesthesia and undergoing a surgical procedure. Rather, it may be fairly concluded that a doctor will assume that a patient knows she should return to normal activities when she feels able to do so. Thus, under the particular facts of this case, the fact that plaintiff was not told by a doctor that she should take Friday off from work should not by itself preclude a finding of incapacity.

While it might be possible to conclude, even in the absence of a doctor's certification, that plaintiff was unable to work or perform her normal daily activities on the Friday immediately following the D and C, it is more difficult to say that she was incapacitated throughout the weekend. Plaintiff has produced no evidence to establish that her activities were in any way impaired or curtailed on Saturday, May 27 and Sunday, May 28. This deficiency is pivotal, for if plaintiff in fact was not incapacitated on Saturday and Sunday, she is unable to satisfy the threshold requirement of incapacity for more than three days. Furthermore, the fact that Saturday and Sunday were plaintiff's usual days off is of no consequence to the analysis.[6] In

6. Plaintiff worked a twelve hour shift which often included an included an overnight stay, Monday

order to defeat summary judgment, plaintiff must produce sufficient evidence to demonstrate that she was incapacitated within the meaning of the Act for more than three consecutive days. Although plaintiff was not scheduled to work Saturday and Sunday, she must nonetheless prove that she would not have been able to work or perform her customary daily activities on those days. While it can be readily assumed that plaintiff continued to feel some residual effects of the procedure throughout the weekend, plaintiff simply has not established that she was incapacitated on Saturday and Sunday as that term is used by the Act.

### (3)

HDA contends that even if plaintiff were able to make a showing of incapacity on Friday, Saturday, and Sunday, this would amount only to a demonstration that plaintiff was incapacitated for three days, whereas the regulations require an incapacity lasting more than three days. *See* 29 C.F.R. § 825.114. HDA asserts that plaintiff falls short of the mark because she cannot count Thursday, May 25, toward the "more than three days" requirement since she worked that day and further, because she acknowledged that she would have been able to return to work on Monday, May 29. Thus, according to HDA, even assuming that plaintiff was incapacitated on Friday, May 26, and even if she had offered some evidence which would demonstrate that she was incapacitated throughout the weekend, plaintiff cannot surmount the additional obstacle of establishing that her incapacity actually lasted more than three days.

Although this issue need not be decided since plaintiff has failed to produce evidence that she was incapacitated on Saturday and Sunday, it is one which, nonetheless, warrants brief examination. Neither the Act itself nor the regulations issued pursuant to the Act defines what is meant by "more than three days." Specifically, they do not indicate whether "more than three days" means

a minimum of four days, or whether an incapacity of seventy-three hours would satisfy the "more than three days" requirement. Furthermore, nowhere is it clarified whether a "day" for purposes of the "more than three days requirement" is measured in terms of a work day (eight hours, in the conventional sense), or literally, as in a full twenty-four hours.

There appears to exist one case which supports the proposition that "more than three days" means at least four days. *See Murray v. Red Kap Indus., Inc.,* 124 F.3d 695, 698 (5th Cir.1997). There also appears to be mild support for the argument raised by HDA, that a plaintiff cannot count a day on which she worked toward the "more than three days" requirement. *See Price v. Marathon Cheese Corp.,* 119 F.3d 330, 334 (5th Cir.1997).

Given that the Act does not provide guidance for the meaning of "more than three days," however, it seems appropriate to construe the phrase literally, permitting the inclusion of a partial day of incapacity toward the "more than three days requirement." There can be no doubt that plaintiff, who was under general anesthesia for part of the day on Thursday, May 25, was incapacitated as that term is used by the Act for at least a portion of that day. Thus, if plaintiff could also demonstrate that she was incapacitated throughout Friday, Saturday, and Sunday, it seems apparent that she would literally satisfy the "more than three days" requirement. As previously stated, however, the fact that plaintiff did not establish an incapacity on Saturday and Sunday obviates the need to decide this question.

### (4)

Plaintiff contends that notwithstanding that the bleeding she experienced turned out to be an isolated incident of short duration and one that was treated with relative ease, she could not have known this at the time she made the decision to go to the hospital.[7] Plaintiff appears to argue that she

---

through Friday. It appears that her typical workweek would begin on Monday morning and would end early Saturday morning. *See* Tr. Pl. Dep. at 34–35, 47–48.

7. It bears noting that plaintiff testified at her deposition that she went to the hospital because she knew that her doctor would not be in the office that day. Plaintiff testified that her doc-

responded to an alarming situation with proper precaution and that her ultimate diagnosis and the duration of her condition should not preclude the Act's coverage. Sympathetic as the court is to this argument, it would appear that this subjective approach to determining whether plaintiff had a serious health condition has no support in either the Act or its implementing regulations. While plaintiff was understandably startled by the sudden and unexpected onset of the symptoms she experienced, the Act does not appear to support the proposition that the potentiality of a serious health condition can transform what is actually a minor illness into a "serious health condition" within the meaning of the Act. *See Seidle v. Provident Mut. Life Ins. Co.*, 871 F.Supp. 238, 246 (E.D.Pa.1994) ("[T]he FMLA and its implementing regulations defining 'serious health condition' are not concerned with the potential dangers of an illness but only with the present state of that illness.") (citing 29 U.S.C. § 2611(11)). As another court has stated in a case involving a man who experienced unexplained rectal bleeding, a situation somewhat analogous to the instant case:

> The condition must be taken for what it was during the relevant time period, and not for what it could have conceivably become.... Bauer's condition of rectal bleeding, whatever medical label we might attribute to it, is simply not the sort of serious medical condition which Congress contemplated to be covered by the FMLA. The fact that it could have turned out to be something as serious as rectal cancer or as relatively insignificant as hemorrhoids is speculative and irrelevant.

*Bauer v. Dayton–Walther Corp.*, 910 F.Supp. 306, 311 (E.D.Ky.1996) (footnote omitted) (citing *Seidle*, 871 F.Supp. at 246), *aff'd*, 118 F.3d 1109 (6th Cir.1997). Plaintiff may well have been frightened that her symptoms signified a true medical emergency, and her actions in light of this fear were both prudent and understandable, but the fact that her condition turned out to be, fortunately for her, relatively benign is controlling as to whether the Act's protection can be invoked.

Plaintiff further argues that she has established a serious health condition because her condition is analogous to a miscarriage, a malady which is enumerated within the legislative history of the Act as constituting a serious health condition. Even if this were true, plaintiff's argument appears to suggest that those conditions which were enumerated by Congress in the legislative history of the Act are de facto serious health conditions and, therefore, need not satisfy the criteria set forth by the Secretary of Labor in 29 C.F.R. § 825.114. This argument must fail. It seems clear that notwithstanding the illustrative list provided by Congress, the requirements for establishing a serious health condition must still be met with respect to any of the ailments on the list. Indeed, the legislative history of the Act reveals that in providing this illustrative list, Congress acknowledged that "[a]ll of these conditions meet the general test that either the underlying health condition or the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery." H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S.Code Cong. & Admin. News 1993 at 3, 31. To be sure, it would be surprising if any of the illnesses listed by Congress would not give rise to an incapacity lasting more than three days, but to the extent that an enumerated illness of a shorter span is possible, there is no reason to assume that such an illness would be covered by the Act in the absence of a showing of inpatient care.

Finally, in support of her cross motion for summary judgment, plaintiff emphasizes the fact that she produced evidence that she received treatment from her gynecologist following the D and C which included a prescription for medication, and that this constitutes continuing treatment. Because plaintiff has failed to establish that she had an incapacity which lasted more than three days, however, it is not necessary to proceed to the question of whether plaintiff received

---

tor's office days are Tuesday and Saturday, and that had plaintiff experienced this bleeding on a Tuesday or Saturday, she would have gone to the doctor's office instead of the hospital. *See* Tr. Pl.Dep. at 119–20.

continuing treatment by a health care provider. Plaintiff has not passed the threshold inquiry in establishing that she had a serious health condition under the continuing treatment alternative of 29 U.S.C. § 2611(11).

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied. The clerk of the court is directed to enter judgment in accordance with these instructions and close the case.