Shirley J. BONES, Plaintiff,

v.

HONEYWELL INTERNATIONAL, INC., f/k/a Alliedsignal, Inc., Defendant.

No. 00–4129–SAC.

United States District Court, D. Kansas.

Sept. 20, 2002.

1204

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for plaintiff.

Katherine A. Hansen, Spencer, Fane, Britt & Browne, Kansas City, MO, J. Nick Badgerow, Daniel B. Boatright, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on defendant's motion for summary judgment. Plaintiff alleges that her termination from employment with the defendant was in violation of the Family and Medical Leave Act, 29 U.S.C. § 2615 (FMLA), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., (ADA), and Kansas law prohibiting retaliation for her exercise of protected rights relating to workers compensation.

## SUMMARY JUDGMENT STANDARD

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Under this standard, this court examines the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.,* 147 F.3d 1200, 1214 (10th Cir.1998).

When the nonmovant will bear the burden of proof at trial, he can survive summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence, as a triable issue, of any essential and contested element of his case. *See McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir.1998).

## FACTS

Plaintiff began working for defendant's predecessor in 1976. Her elbow problems began in 1989 when she was at home stacking and throwing wood. She informed defendant soon thereafter of her elbow soreness, but told defendant it was not a result of any injury she sustained at work. From 1991 through May of 1997, plaintiff applied for and was granted medical leave for various reasons other than her elbow. Each time plaintiff did so, she advised her supervisor that she was going to be absent. In June of 1997, plaintiff saw her personal physician, Dr. Severa, regarding a flare-up of tendinitis in her right elbow and received some restrictions, which defendant complied with. On July 7, 1997, plaintiff requested "work comp papers" from defendant's medical department, but plaintiff did not state that she had suffered a work related injury. Defendant's nurse Robin Thompson offered plaintiff the workers compensation handbook, explained the differences between workers compensation and private insurance, and explained that defendant would look at her work station. Plaintiff indicated that she would "think about" filing a workers compensation claim or staying with her primary care provider, but did not file any workers compensation claim during her employment with defendant.

On that same date, plaintiff spoke to Dr. Steelman, a physician working with defendant, regarding her elbow. He evaluated plaintiff and her work station, and conclud-

ed that her elbow condition was not caused by her work, in part because the tasks she performed required minimal force and minimal repetition.

In August of 1997, plaintiff sought and received medical leave for her elbow pain and, as in the past, informed her supervisor of her absence. Plaintiff had surgery on her elbow in 1998, and was restricted thereafter to no repetitive use of her right elbow and no lifting over five pounds. Plaintiff returned to work in April of 1988. After her surgery, plaintiff requested and received three medical leaves, again advising her supervisor each time of her absences.

In September of 1998, plaintiff was moved to the position of subassembly on a line which manufactured small component parts for aircraft. This placed her under the supervision of Shawn Reniker, who admits his awareness of plaintiff's restrictions, but denies all knowledge of any alleged work injury. Plaintiff's new work station was evaluated by Dr. Steelman to determine whether the activities required were within plaintiff's restrictions. He recommended certain modifications of tasks, and those modifications were made. Plaintiff requested and received time off from September 2, 1998 until October 11, 1998, and as in the past, advised her supervisor of her absence.

When plaintiff did not return to work on the date defendant expected her to, defendant sent plaintiff a letter dated October 21, 1998, stating that three consecutive days of absence without notice to her supervisor is considered as voluntarily termination, pursuant to the company's routine practice, and that her employment would be terminated if she did not return to work or notify her supervisor of the reason for her absence. Plaintiff does not recall having received this letter, but admits that when she attempted to return to work, supervisor Reniker told her that she had

been sent a termination letter for failure to call in for three days. Plaintiff claimed that she had in fact called in, and no disciplinary action was taken regarding her delayed return.

In January of 1999, plaintiff began working as a material handler, which position required less repetitive motion than did the assembler position. Plaintiff remained under the supervision of Shawn Reniker. In this position, plaintiff took parts to the assemblers, washed material for them, and counted units. Plaintiff admits that she was able to perform all the functions of this position except the heavy lifting, which other employees did for her upon her request.

The events which gave rise to plaintiff's termination occurred in July of 1999. Plaintiff took vacation and personal days on July 19, 20, and 21. Plaintiff called in those absences by reporting them to her co-worker, Judy Fuller, and made no mention of any work injury. Plaintiff went to see Dr. Severa on July 22, 1999, regarding her elbow and stress in her life and neither went to work nor called about her absence that day.

On Friday, July 23, plaintiff neither attended work nor called in her absence to anyone. On that date, however, plaintiff's boyfriend delivered to defendant's medical department a medical leave of absence request from plaintiff for a non-occupational illness or injury, completed by plaintiff's physician. It indicates that Dr. Severa saw plaintiff on July 22, and states that plaintiff was unable to work from July 18, 1999, to August 16, 1999. The medical restrictions, limitations, or complications preventing plaintiff from returning to work were listed as "fatigue, joint pain and stiffness." (Dk. 69, Exh. T.) Plaintiff neither attended work the following Monday, July 26, nor called in her absence.

Plaintiff was notified by letter dated Tuesday, July 27, 1999, that since she did not report to work or call her coach (supervisor) or team to notify them of her absences on July 22, July 23, and July 26, (three consecutive working days), she was deemed to have voluntarily terminated her employment. The decision to terminate her employment was made by her supervisor, Shawn Reniker, and defendant's human resource generalist, April van Rensburg. It is undisputed that at the time of the decision to terminate plaintiff's employment, neither of these individuals knew that plaintiff had applied for a medical leave of absence.

It is the practice of defendant's medical department to process medical leave requests only on Thursdays. In accordance with this practice, plaintiff's request was not processed until Thursday, July 29, two days after plaintiff was terminated. Amy Clark, an administrative assistant for defendant's health, safety and environment division, reviewed plaintiff's leave of absence request, but could not read Dr. Severa's writing. She then conferred with the company physician, wrote "denied" on the medical leave request, and unsuccessfully attempted to contact plaintiff on the 29th to set up an appointment for her to see the company physician.

On July 30, Ms. Clark, of the medical department, called Ms. van Rensburg, in human resources, to inform her that she was trying to contact plaintiff regarding a medical leave request, and was told that plaintiff had been terminated earlier that week. This was Ms. van Rensburg's first notice that plaintiff had applied for medical leave, and Ms. Clark's first notice that plaintiff had been terminated.

Plaintiff understood that absence from work for three consecutive working days without notice to the company could constitute grounds for discipline up to and including termination, but claims she was unaware that she had to notify her department or supervisor when she had requested a medical leave of absence.

Defendant's medical leave of absence procedures provide: "You must follow the "call-in policy" for your department. *Health Services will not call your manager for you.*" (Bold and underline in original.) (Dk. 69, Exh. R, p. 2). The policy for plaintiff's department at the relevant time was for an employee who was going to be absent to notify supervisor Reniker, either by speaking to him personally or by leaving a message on his voice mail, or by relaying a message through a friend. In the event the medical department approves a request for leave, it advises human resources and management of the dates the employee is authorized to be absent, the date the employee is expected to return to work, and whether the employee has any work restrictions.

## Workers compensation retaliation

The court first examines plaintiff's claim that her termination was in retaliation for her intent to file a workers compensation claim. Plaintiff contends that she suffered a work-related injury, was discouraged from filing a workers compensation claim by nurse Thompson on July 7, 1997, and filed such a. claim approximately six months after her termination.

Under Kansas law an employer cannot fire an employee in retaliation for the employee's filing of a workers compensation claim. *Murphy v. City of Topeka–Shawnee,* 6 Kan.App.2d 488, 630 P.2d 186 (1981). Kansas law also prohibits firing an employee who has not yet filed a workers compensation claim if the employee is absent from work due to a work-related injury and might file a workers compensation claim. *Ortega v. IBP, Inc.,* 255 Kan. 513, 874 P.2d 1188 (Kan.1994); *Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, Syl. ¶ 3, 752 P.2d 645 (1988); *See Foster v.*

*Alliedsignal, Inc.,* 293 F.3d 1187 (10th Cir. 2002). Thus any absences caused by an employee's work-related injury should not be counted against the employee by her employer. *Foster,* 293 F.3d at 1192.

■ Plaintiff can recover under this state law claim by:

"proving that [her] discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Sanjuan v. IBP, Inc.,* 160 F.3d 1291, 1298 (10th Cir.1998) (quoting *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 815 P.2d 72, 88 (Kan. 1991)). However, she does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Id.* Nor must she provide direct proof of retaliatory intent. "Retaliatory discharge cases must generally be proven by circumstantial rather than direct evidence because rarely will an employer admit to having discharged an employee in retaliation for exercising a right." (Citations omitted).

■ Because such cases are rarely proven by direct evidence, the Kansas courts have adopted the *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge cases. *See Sanjuan v. IBP, Inc.,* 275 F.3d 1290, 1294 (10th Cir.2002). At the first stage, a plaintiff makes out a prima facie case raising a rebuttable presumption of retaliatory intent by showing that

(1) he or she filed a claim for workers' compensation benefits, or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of plaintiff's compensation claim, or the fact that he had sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed

between the protected activity or injury, and the termination.

*Sanjuan,* 160 F.3d at 1298. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory justification for the discharge. *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1116 (10th Cir.2001). "If the employer meets this burden, the burden shifts back to the plaintiff but the plaintiff must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act." *Id.* (quotation omitted).

*Foster,* 293 F.3d at 1192–93 (footnotes omitted).

Defendant disputes that it had knowledge of any work-related injury, and denies any causal connection between plaintiff's termination and any work-related injury.

### Defendant's knowledge

Plaintiff contends that notice to defendant's medical department, provided via her leave of absence request, should be imputed to those who made the decision to terminate her employment.

■ The law does not support that assertion. "To establish a causal connection, a plaintiff must establish that the individual or individuals who actually undertook the alleged retaliatory acts were aware or should have been aware of plaintiff's participation in the protected activity." *Foster,* 293 F.3d at 1193 (citing cases). Thus plaintiff is required to make a prima facie showing that the company personnel responsible for firing her either knew or should have known that her absences were related to a work injury. *See Williams v. Columbia/HCA Healthcare Corp.,* 1999 WL 592674 at *5 (D.Kan., July 30, 1999).

Plaintiff claims that in 1997 she told her supervisor, David McFadden, defendant's nurse Thompson, her personal physician Dr. Severa, and defendant's physician, Dr. Steelman, that she believed her elbow problem was the result of a work injury. Even assuming the truth of plaintiff's statements, it is undisputed that none of these individuals was involved in the decision to terminate plaintiff's employment, or is alleged to have conveyed their knowledge to those who did. Further, plaintiff has not shown how her statements, made in 1997, have any relevance in showing that those who fired her in 1999 either knew or should have known that her absences were related to a work injury.

Plaintiff does allege that she informed supervisor Reniker, who was involved in the 1999 termination decision, of her work injury. The cited testimony fails to support plaintiff's assertion, however. It states:

- And did you ever tell Shawn that you believed your arm injury was a result of anything that happened at work?
- Yes, I believe he knew.
- You told him?
- I believe I did, yes.
- What is it you base your opinion on that you told Shawn that your injury was related to something that happened at work?
- Because he knew I had surgery and that it bothered me to do the repetitious work.
- Anything else you base your conclusion on?
- No.
- I guess what I need to ask you is did you ever tell Shawn specifically the injury to my elbow happened at work?
 - I don't recall specifically saying.

(Dk. 80, Bones depo. p. 195). This record refutes plaintiff's assertion that she ever told supervisor Reniker that her elbow condition was caused by her work. That supervisor Reniker knew plaintiff had elbow surgery and was bothered by repetitious work has no tendency to show that he knew plaintiff's elbow condition was work related.

Nor does the record show that plaintiff ever informed supervisor Reniker of her intent to file a workers compensation claim. When asked, "Did you ever tell Shawn Reniker that you had filed or were going to file a workers compensation claim?" plaintiff replied: "I don't recall." (Dk. 80, Bones depo. p. 168). Supervisor Reniker testified that he had no knowledge until the date he was deposed that plaintiff claimed any part of her condition was due to a work injury. (Dk. 69, Exh. B, p. 195.) Reniker's testimony is thus uncontroverted.

Plaintiff does not contend that Ms. van Rensburg, the only other participant in the decision to terminate her employment, had any knowledge that plaintiff suffered from a work-related injury. Therefore, plaintiff has not met her burden to show that the decision makers knew or should have known of her work-related injury.

### Causal connection

Further, plaintiff fails to show any causal connection between her work-related injury, if any, and her termination. Plaintiff was terminated on July 27, 1999. Plaintiff never filed a workers compensation claim until six months after her employment with defendant was terminated, and does not show that she ever discussed so doing with any employee of defendant at any time other than on July 7, 1997, over two years prior to her termination. The record fails to reveal when plaintiff's work-related injury, if any, occurred. Even assuming that plaintiff's supervisor knew that she had elbow surgery in 1997, or had reason to know of her elbow problems on October 21, 1998 (when plaintiff was sent

the letter warning her to report or be terminated), these dates are too remote in time from her termination in 1999 to warrant any inference of causal connection.

Aware that "close proximity in time may provide some probative evidence of retaliatory intent," *Foster*, 293 F.3d at 1196, plaintiff focuses upon her July 23, 2002, application for leave, four days prior to her termination. But defendant has shown that the decision-makers had no access to the records in the medical department, and no reason to know that plaintiff had requested leave. Given the undisputed fact that the decision-makers had no knowledge that plaintiff had applied for medical leave the very week she was terminated, no causal connection can be based upon this event.

Plaintiff has not come forward with any evidence indicating that she placed either decision maker on notice that she had been injured on the job or that she intended to file a workers' compensation claim. Even if the medical department's knowledge that plaintiff had applied for medical leave were somehow imputed to the decision makers, the decision-makers would not be on notice that plaintiff's absences in July of 1999 were due to a work-related injury. The leave form plaintiff completed does not so indicate. Plaintiff does not allege that she made any statement at or near the time of her July 1999 absences, nor does any other evidence of record tend to show that defendant's medical department knew or should have known that plaintiff's absences in July were due to a work-related injury.

■ Plaintiff's evidence is far from that necessary to establish a prima facie case of retaliation. But even had she done so, defendant has carried its burden to articulate a legitimate, non-retaliatory justification for the discharge by contending that plaintiff was terminated because she violated its attendance policy. *See Foster*,

293 F.3d at 1194. Plaintiff has failed to present any evidence, circumstantial or otherwise, from which one might derive an inference of retaliatory intent. Plaintiff's evidence, if believed by the jury, is insufficient to demonstrate that her discharge was based on, because of, motivated by, or due to defendant's intent to retaliate. In short, the record fails to set forth "evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer." *Foster*, 293 F.3d at 1195. Accordingly, summary judgment on this claim is warranted for multiple reasons.

**FMLA claim**

The court next addresses defendant's FMLA claim, which is brought solely under the interference theory. *See* Pretrial Order, p. 13, § 6.1. This claim arises from § 2615(a)(1), which states: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." *See Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 732 (10th Cir.2000) (examining the sufficiency of evidence for a jury's determination that an employer did not interfere with its employee's entitlement to FMLA leave when he was fired while on leave); *Tate v. Farmland Indus.*, 268 F.3d 989, 997 (10th Cir.2001); *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir.2002). Plaintiff contends that defendant terminated her for absences that were protected by the FMLA and were adequately explained to defendant in her medical leave request.

The FMLA provides, in pertinent part, that an eligible employee shall be entitled to a total of 12 workweeks of unpaid leave during any 12 month period for conditions

including the employee's own serious health condition which renders the employee unable to perform the functions of his or her position. 29 USCA § 2612. Defendant concedes that plaintiff was an "eligible employee," but disputes that plaintiff had a "serious health condition." Defendant additionally contends that plaintiff did not give adequate notice of her need for FMLA leave.

### Serious Health Condition

29 CFR § 825.114(a)(2) provides that a "serious health condition" entitling an employee to FMLA leave includes an illness, injury, impairment, or physical or mental condition that involves continuing treatment by a health care provider. A "serious health condition involving continuing treatment by a health care provider" is defined to include a period of incapacity (i.e., inability to work ... due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves treatment two or more times by a health care provider. Under the circumstances present in this case, the plaintiff must make a two-pronged showing of both an incapacity requiring absence from work, and continuing treatment. See 29 U.S.C.A. § 2612; 29 C.F.R. § 825.114.

Tendinitis is neither specifically included in nor expressly excluded from those conditions which constitute a "serious health condition," see 29 CFR § 825.114 (listing examples of conditions that do and do not meet the definition of a serious health condition). Few cases have examined whether tendinitis constitutes a "serious health condition" as that term is defined

for purposes of the FMLA. *See Bond v. Abbott Laboratories,* 7 F.Supp.2d 967, 977 (N.D.Ohio 1998) (finding plaintiff's tendinitis not to be a serious medical condition under FMLA based upon lack of incapacity). Because of the fact-specific nature of the inquiry, however, the court makes this determination on a case by case basis.

### Incapacity

Defendant's primary assertion is that plaintiff has not proved a sufficient period of incapacity to withstand summary judgment. Defendant contends that plaintiff's admission that she was able to perform her job on two of the three critical days she was absent precludes a finding that plaintiff's tendinitis kept her from performing the functions of her job on those days.

Plaintiff does not dispute that she so testified. In her deposition, plaintiff stated that she was able to work on July 22 and 23, although it would have been painful, but was unable to work on July 26 because she had the stomach flu.[1] But plaintiff asserts that her physician noted on the form which defendant's medical services department received on July 23, that she was unable to work from July 18, 1999 to August 16, 1999. (Dk. 69, Exh. T). That medical leave claim form describes the "basis for claim" as: "right arm, elbow, wrist, inflamation, pain." *Id.* Although much of the form is illegible to this court, and is not clarified by the parties, it does evidence a physician's signature, and reflect the date the employee was "unable to work" as "7–18–99," and the date "employee can return to work" as "Aug. 16 '99," thus encompassing the three crucial absence dates of July 22, 23, and 26.

---

1. It is uncontested that plaintiff did not see her doctor regarding her stomach flu, and plaintiff does not contend that her flu is a serious health condition. *See George v. Associated Stationers,* 932 F.Supp. 1012, 1015

(N.D.Ohio 1996) (noting federal regulations promulgated under Family Medical Leave Act (FMLA) exclude the flu and certain other ailments from definition of "serious medical condition").

Defendant urges the court to discount the medical leave form, and credit only plaintiff's testimony to the effect that she was able to work on two of the three days which formed her critical absence period, citing *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D.Tenn.1995). There, the court found no proof that plaintiff was "incapacitated" for more than three calendar days where she stayed home from work for more than three days, but did not show she was unable to work, or that her absence was "due to" her illness. *Brannon* is distinguishable from the present case, however. There, the physician "never advised plaintiff to remain off work," 897 F.Supp. at 1037, and could not testify "that plaintiff was unable to perform the functions of her job ... in light of her illness." *Id.* Given those facts, the court found that plaintiff's own testimony that she was "too sick to work" was "insufficient to prove that her absence was necessary." Here, plaintiff's physician advised plaintiff to remain off work for a period of time encompassing the three critical days which led to plaintiff's termination.

Defendant essentially invites the court to ignore the note from plaintiff's physician that she should be off work for the entire contested absence period, and to consider solely plaintiff's own contradictory testimony that she was able to work on two of the three days. The court finds no basis for ignoring the treating physician's opinion that plaintiff was unable to work, and believes that plaintiff's testimony regarding her ability to work is not conclusive but, at best, creates a question for the jury on the issue of incapacity.

### Continuing treatment

Defendant does not challenge the "continuing treatment" aspect of the serious medical condition requirement, and the medical leave claim form completed by plaintiff's physician indicates that plaintiff saw him on July 22, and was to see him again in two to three weeks. The statutory requirement of continuing treatment thus appears to be met. Accordingly, summary judgment for the defendant is not warranted on the basis of plaintiff's lack of a serious health condition.

### Notice

Defendant next contends that even assuming plaintiff has a serious health condition, plaintiff failed to give adequate notice of her need for FMLA leave. Defendant does not challenge the content of the statements in plaintiff's medical leave claim form, and agrees that an employee "need not expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave." § 825.208(a)(2). Nor does defendant take issue with the timing of the notice plaintiff provided. *See* 29 C.F.R. § 825.303(a) (where need for medical leave is unforeseeable "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case."). Rather, defendant challenges the fact that plaintiff gave notice solely to defendant's medical department instead of notifying plaintiff's supervisor as well, as defendant's own policies require. Plaintiff asserts that her request for medical leave constitutes sufficient notice to the company, and that she was unaware of any requirement to call a medical leave absence in to her supervisor.

Defendant's "General Rules of Conduct," prohibit "absence from work for three (3) working days without notification to the company." (Dk. 69, Exh. U). Plaintiff admits that she understood these General Rules of Conduct to be the rules in force when she was employed by defendant, and further admits that she understood that

absence from work for three working days without notification to the company could constitute grounds for discipline up to and including termination.

■ Defendant's Medical Leave of Absence Procedures provide: "You must follow the "call-in policy" for your department. **Health Services will not call your manager for you.**" (Dk. 69, Exh. R, p. 2 (Bold and underline in original)). Plaintiff admitted that she received this form on one or more occasions.

- Was this the form that was attached to the sick leave claim form that you obtained from the medical department each time you applied for sick leave?
- Not each time, no.
- But you recall it being attached one or more times to the sick leave claim form?
- Yes.

(Plaintiff's depo., p. 133). Although plaintiff claims never to have read this language, the court finds that by virtue of plaintiff's receipt of this document she is deemed to have knowledge that she was to follow her department's call-in policy, and that the medical department would not call her supervisor for her.

■ Additionally, the record contains a letter to plaintiff from defendant's human resources department dated October 21, 1998. It is uncontested that this letter was sent to plaintiff, properly addressed. (Defendant's uncontroverted fact no. 30.) It states:

As you know, it is the responsibility of every Allied Signal employee to properly notify their supervisor in the event they are unable to report to work. Failure to properly notify your supervisor and failure to report to work are termed as "no call, no show." In keeping with our past practices, 3 consecutive days of "no show, no call" is considered as voluntary termination on the part of the employee.

In the event that you do not return to work or call your supervisor ... by close of business on [stated date], we will determine that you have voluntarily resigned your employment with Allied Signal.

Dk. 69, Exh. N. This letter is properly presumed to have been received by plaintiff. *See Witt v. Roadway Exp.*, 136 F.3d 1424, 1430 (10th Cir.1998) ("A rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service.") Plaintiff thus acquired knowledge of the matters stated therein. Although evidence denying receipt may create a credibility issue that must be resolved by the trier of fact, *see id.*, plaintiff has not denied receipt. Instead, she testified that she does not recall having received this letter. (Plaintiff's depo. p. 117–18). Plaintiff's lack of recall fails to create a factual issue regarding her receipt of the letter.

Lastly, it is undisputed that plaintiff advised her supervisor on each occasion when she was absent and sought medical leave before July of 1999. The parties agree that this occurred approximately twelve times. Plaintiff's consistent pattern of reporting her medical leave absences to her supervisor or to someone in her department on each of numerous prior medical absences evidences her understanding of defendant's requirements.

The court finds that plaintiff had sufficient notice of defendant's policy that it was the duty of the employee to contact his or her supervisor to report an absence. Plaintiff knew or should have known that she was required to notify her supervisor in the event she was unable to work, and that three consecutive working days of "no show, no call" would be considered grounds for termination.

The same form indicates that defendant's medical department would review the information, and "approve or disapprove the Medical Leave of Absence." (Dk. 69, Exh. R). If a medical leave is not approved, the time absent "will be coded as Personal Illness or Personal Business." (*Id.*) Although plaintiff reads this language as an assurance that one way or the other, her absences would be excused, this does not excuse plaintiff from the requirement of notifying her supervisor of her absences, whether or not they are for medical leave.

### Employer's policy v. FMLA requirements

The parties' assertions raise the issue whether an employer's policies regarding notice can require more than the FMLA does. Defendant contends that "when seeking FMLA leave, plaintiff is required to comply with the employer's usual and customary notice and procedural requirements for requesting leave." Dk. 82, p. 28. *See* 29 C.F.R. 825.302(d) ("An employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave.")

This regulation has been relied upon in several cases which have upheld employers' "no show no call" rules against claims of FMLA violations. In *Gilliam v. United Parcel Service, Inc.*, 233 F.3d 969, 972 (7th Cir.2000), a plaintiff requested and received FMLA leave on a Friday, but did not contact his employer until the following Thursday. The court found that the employee was properly terminated because he failed to follow the collective bargaining agreement's requirement that an employee on leave call his supervisor no later than the beginning of the third day of leave. The court held that "nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans." *Gilliam*, 233 F.3d at 970–71. "One of those "usual and customary" requirements at UPS is that the employee let his supervisor know, no later than the beginning of the third working day of leave, how much more time will elapse before the employee returns to work." *Id.*, at 971.

Similarly, in *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706 (7th Cir.2002), a three day no call rule was upheld against claims of FMLA violations. There, the employer's attendance policy provided that if no return to work date were stated by the doctor, the employee must call in advance every day she was scheduled. Because the employee's original off-work slip provided no return to work date, she was required to call in advance of her absences following her scheduled vacation. Plaintiff's failure to do so despite her awareness of the rule warranted her termination, which was found not to violate the FMLA. *Id.* at 710. *See also Alexander v. Ford Motor Co.*, 204 F.R.D. 314, 318 (E.D.Mich. 2001) (finding employer's rule requiring employees to notify the company of their intentions within five days of the conclusion of leave not violative of the FMLA because it requires only that the employee notify the employer when he or she needs to be absent.)

The FMLA does not specify the person to whom the notice is to be given, stating solely that "an employee should give notice to the employer of the need for FMLA leave ..." 29 C.F.R. § 825.303(a). The Tenth Circuit has held, in another context, "the FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent in a nonemergency situation." *Holmes v. The Boeing Co.*, 166 F.3d 1221, 1999 WL 9760, at *3 (10th Cir.1999) (Table).

Here, as in *Holmes,* plaintiff has not alleged that her physical condition was such that she could not have complied with defendant's reasonable notice requirements. The court finds that "the goals of the FMLA are not compromised when a company ... enacts internal policies and procedures requiring employees seeking FMLA leave to notify a particular department or a particular supervisor." *Cavin v. Honda of America Mfg. Inc.,* 2002 WL 484521 (S.D.Ohio, Feb. 22, 2002). The court finds that defendant's internal policy which required plaintiff to contact her supervisor is reasonable and was made known to the plaintiff, and that by failing to comply with the policy plaintiff failed to give proper notice under the FMLA.

In the alternative, the court finds that defendant has met its burden to prove that plaintiff would have been dismissed regardless of the employee's request for FMLA leave because of her failure to comply with defendant's reasonable policy regarding notification of absences. *See Smith v. Diffee Ford–Lincoln–Mercury, Inc.,* 298 F.3d 955, 963 (10th Cir.2002). Summary judgment is thus appropriate on plaintiff's FMLA claim.

## ADA Claim

Plaintiff claims that defendant violated the ADA by failing to reasonably accommodate her request for medical leave on and after July 27, 1999, and by terminating her in retaliation for such request. (Pretrial order, p. 8–9). It is established that limited leave for medical treatment may qualify as reasonable accommodation under the ADA. *Smith,* 298 F.3d at 967, citing *Rascon v. U.S. West Communications, Inc.,* 143 F.3d 1324, 1333–34 (10th Cir.1998) (citing *Hudson v. MCI Telecomms. Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996)).

## Failure to accommodate

In order to establish a prima facie case of failure to accommodate under the ADA, a plaintiff must prove "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ....; and (4) that the [employer] refused to make such accommodations. (Citations omitted)." *Spielman v. Blue Cross and Blue Shield of Kansas, Inc.,* 33 Fed.Appx. 439, 443, 2002 WL 524549 (10th Cir.2002).

The Tenth Circuit has recently reviewed the meaning of "disability" in stating:

Under the Act, a "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A major life activity is a "basic activity that the average person in the general population can perform with little or no difficulty.... The touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.) (quotation marks, alterations and citations omitted), *cert. denied,* 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999). "Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working." *Doyal v. Oklahoma Heart, Inc.,* 213 F.3d 492, 495–96 (10th Cir.2000). We analyze only the major life activity or activities asserted by the plaintiff. *Id.* at 496.

*Rakity v. Dillon Companies, Inc.,* 302 F.3d 1152 (10th Cir.2002).

"The three factors that should be considered when determining whether an impairment substantially limits a major life activity are: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment."

*Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir.1994) (quotation marks and alterations omitted), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). In presenting a prima facie case, the burden is on the plaintiff to show the nature, duration, and impact of her impairment on the major life activity. *See id.*

### Hobbies

Plaintiff asserts that her elbow impairment substantially limits the major life activities of "hobbies, like gardening and cooking and baking." Plaintiff testified that the condition of her arm impaired these activities by reducing the type or amount of gardening she does, and the amount of cooking she does, in stating:

- ... what is your disability?
- Not being able to use my arm like I always have.
- And did that condition affect any of your major life activities?
- Yes.
- What?
- My hobbies, like gardening and cooking and baking.
- Anything else?
- No.
- How does the condition of your arm affect your gardening?

A. It hurts to use it.
- Are you right-handed?
- Yes.
- And it's in your right elbow?

- Yes.
- And have you continued to garden?
- I had planted some things but not like I used to.
- Compare for me what you used to do before you had this elbow injury compared to what you do now in the garden.
- Plant a lot more, get down and dig. I don't now.
- Now, how has the condition of your elbow affected your cooking and baking?
- I don't do it anymore.
- Whereas before when the boys were home, you did more cooking and baking?
- Yes.
- How does the condition of your elbow affect that?
- It hurts to do it.

(Dk. 69, Exh. A, pp. 177–78).

The court finds that plaintiff's elbow pain which deters her from gardening and cooking as she used to is not a substantial limitation of a major life activity. Plaintiff has not shown that gardening, cooking or baking are major life activities. The court thus examines whether plaintiff's elbow condition substantially limits her in the major life activity of "manual tasks."

A "substantial limitation" is not a mere difference in an ability to perform a particular act. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). The ADA is concerned only "with limitations that are in fact substantial." *Id.* That plaintiff's elbow hurt when she cooked or gardened or that it prevented her from doing the extent of those activities she did previously fails to present a triable issue that she was "substantially limited" in the major life

activity of manual tasks. *See generally Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222–23 (11th Cir.2000) (finding plaintiff who suffered from tendinitis and was restricted from certain tasks for extensive periods of time failed to demonstrate a substantial limitation of the major life activity of performing manual tasks); *Ouzts v. USAir, Inc.*, 1996 WL 578514 (W.D.Pa. July 26, 1996), *aff'd*, 118 F.3d 1577 (3d Cir.1997) (granting summary judgment to employer on the ground that a plaintiff with carpal tunnel syndrome could not establish a "substantial limitation" of manual tasks, since she was able to perform most ordinary life activities.)

█ Nor has plaintiff shown that defendant perceived her impairment to be one which posed a substantial limitation on one of her major life activities. Plaintiff has not alleged that defendant had any knowledge of any limitation in her ability to garden, cook or bake, or any reason why such knowledge would have any tendency whatsoever to influence any of defendant's employment decisions.

### Working

█ Plaintiff's counsel adds, in her brief, the activity of working. The court is uncertain whether it should address this additional activity, which is asserted only as an afterthought by plaintiff's counsel. The court recalls plaintiff's unequivocal testimony that her arm condition did not affect any major life activities but gardening, cooking and baking, and is mindful of the Tenth Circuit's repeated caution in *Doyal* and *Rakity* that the court should analyze only the major life activity or activities asserted by the plaintiff. Nonetheless, in an abundance of caution, the court will briefly address counsel's assertion that plaintiff's elbow condition substantially limited her major life activity of working.

Plaintiff asserts that her lifting restriction limited her ability to work in production.[2]

█ "[T]o demonstrate that an impairment 'substantially limits' the major life activity of working, . . . [the plaintiff] must show a 'significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Siemon v. AT&T Corp.*, 117 F.3d at 1176. "'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "A 'class of jobs' is defined as '[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.'" *Sutton*, 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)).

Plaintiff contends that she is significantly restricted in her ability to perform the class of production jobs. Yet plaintiff has produced no evidence from which a jury could find that her elbow difficulties prevented or significantly restricted her from performing such jobs. Plaintiff does not attempt to prove that her impairment, if any, barred her from doing anything more than her own particular job for short periods of time. Without the requisite additional proof, plaintiff cannot defeat summary judgment on this claim of disability. *See Kidwell v. Board of County Com'rs of*

---

2. Plaintiff's brief additionally mentions that plaintiff's impairment "substantially limited her major life activity of working, lifting and performing manual tasks," (Dk. 80, p. 55), but because plaintiff fails to advance any argument or analysis regarding the major life activity of lifting, the court will not separately address it.

*Shawnee County*, 40 F.Supp.2d 1201, 1219–1220 (D.Kan.1998); *Gupton v. Commonwealth of Virginia*, 14 F.3d 203, 205 (4th Cir.), *cert. denied*, 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *Rhoads v. F.D.I.C.*, 956 F.Supp. 1239, 1246 (D.Md. 1997). *See also Berg v. Norand Corp.*, 169 F.3d 1140, 1145 (8th Cir.) (suffering from continuous joint pain is not substantially limiting on the major life activity of working), *cert. denied*, 528 U.S. 872, 120 S.Ct. 174, 145 L.Ed.2d 147 (1999).

Plaintiff's five-pound weight limitation had no demonstrable impact even upon her own work, because the weight restriction was included in the doctor's release that allowed plaintiff to return to her regular job on a full-time basis, and the restriction is not alleged to have prevented her from performing her job, apparently satisfactorily and with the sole accommodation that others lift heavier objects upon request by plaintiff.

The court finds no material question of fact that plaintiff's physical restrictions have significantly limited any major life activity. Accordingly, even assuming that plaintiff suffers from a physical condition that causes her discomfort and pain, she is not disabled within the meaning of the ADA.

### Record of disability/Regarded as disabled

Plaintiff also argues, in the alternative, that she was disabled under the ADA because she had a record of a substantially limiting impairment and because she was regarded as having such an impairment. See 42 U.S.C. §§ 12102(2)(B)-(C) (1994 ed.).

### Regarded as disabled

The Supreme Court has held that to be "regarded as disabled," a plain-tiff must show "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In other words, even if plaintiff is not actually disabled, she is considered as "disabled" under the ADA if defendant perceived her as such.

In support of this assertion, plaintiff states only that "she was regarded as having such impairment by her supervisor, [who] even admitted that [plaintiff's] permanent restrictions against production work, pushing, pulling or lifting more than 5 pounds were severe." (Dk. 80, p. 55). The record in support of this statement[3] reflects only the following query with supervisor Reniker:

- "And you knew that she had some pretty severe restrictions, correct?"
 - "I knew that the restrictions were what were stated in this letter."

(Dk. 80, Reniker depo. p. 23). The referenced letter reflects plaintiff's restrictions of "no lifting over 5 lbs" and "no repetitive use of right elbow." (Dk. 69, Exh. L.) Plaintiff's assertion that Reniker admitted the severity of any restriction is unsupported by the record, as is plaintiff's tacit contention that plaintiff had any restriction on production work, pushing or pulling. It is uncontroverted that Reniker knew that plaintiff had work restrictions on lifting and repetitive use, but "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the em-

---

**3.** Plaintiff additionally cites to page 30 of Reniker's deposition, but that page is not includ-ed in any exhibit before the court.

ployee as disabled or that that perception caused the adverse employment action." *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 153 (2nd Cir. 1998).

Defendant's continuing willingness to employ plaintiff in her material handler position amounts to undisputed evidence that defendant did not regard plaintiff as unable to perform a broad class of production jobs. Nothing in the record supports the conclusion defendant believes plaintiff was incapable of performing the job which she performed immediately prior to her termination. The plaintiff offers no evidence from which a jury could reasonably find that defendant mistakenly believed that she had a physical impairment that substantially limited one of her major life activities, or mistakenly believed that her actual, nonlimiting impairment substantially limited a major life activity.

### Record of disability

 The ADA's definition of "disability" may be satisfied by "a record" of an impairment that substantially limits one or more life activities. 42 U.S.C. § 12102(2)(B). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. Pt. 1630, App. 1630.2(k). To satisfy this section, plaintiff must establish that at some point in time her impairment substantially limited one of her identified major life activities. *McKenzie v. Dovala*, 242 F.3d 967, 972 (10th Cir.2001).

 In support of this assertion, plaintiff asserts only that she had a "long record of [an] impairment." (Dk. 80, p. 55). Plaintiff fails to explicitly state what "record" she is referring to, how defendants allegedly relied on that record, whether the record indicated that plaintiff was disabled (and if so, with what disability), or which major life activity her recorded impairment substantially limited. Even as-

suming that plaintiff refers to the medical record of her elbow problems, which reveals that plaintiff's elbow problems began as early as 1989 and that plaintiff informed defendant of them soon thereafter, plaintiff has failed to establish that at some point in time her impairment substantially limited one of her identified major life activities, as is required. Otherwise stated, plaintiff has not established that defendant's record of her disability shows an impairment that satisfies the ADA, as necessary. *See* 29 C.F.R. § 1630.2(k) (Appendix). This claim thus fails.

### Termination/ Retaliation

 The pretrial order contains plaintiff's assertion that "defendant used Ms. Bones' work absences as a pretext to fire her as a result of her disability and in retaliation for her requests for accommodation of her restrictions." (Dk. 56, p. 9) To the extent this language may be read to allege an ADA retaliatory termination claim, it fails for those reasons set forth above which establish that the decisionmakers neither knew nor had reason to know of plaintiff's request for accommodation, *i.e.*, her request for medical leave, at the time they made the crucial decision. To the extent plaintiff intends to allege that she was terminated because of her disability, such a claim fails because plaintiff has not been shown to be disabled, and no causal connection has been shown between any disability flowing from plaintiff's lifting and restrictive movement restrictions which were imposed on June 30, 1998, (Dk. 69, Exh. K), and her termination over a year later. But even had plaintiff established a prima facie case, defendant has carried its burden to articulate a legitimate, non-retaliatory and non-discriminatory justification for the discharge by contending that plaintiff was terminated because she violated its attendance policy. Plaintiff has failed to present

any evidence, circumstantial or otherwise, of pretext from which one might derive an inference that she was terminated based on, because of, motivated by, or due to her disability or in retaliation for any protected conduct under the ADA.

Although plaintiff's brief addresses other issues, they are not included in the pretrial order and will not be addressed herein.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is granted.